THE FIRST CONGREGATIONAL SOCIETY OF WOODSTOCK *vs.* EDWARD SWAN, ADMINISTRATOR OF SAMUEL HEALEY.

Persons forming a society under the act of 1797, *"for the support of the gospel,"* are not confined to the town where such society is organized.

The individuals composing the society may bind themselves by contract *to pay a certain sum annually for the support of the preaching of the gospel*, and cannot discharge themselves from the obligation by changing their religious sentiments. They can only be discharged by a vote of the society, and that appearing of record.

Action of *covenant* on certain articles of agreement, entered into on the 18th day of April, 1808, between the said society and several individuals, of whom the said *Samuel Healey* was one. In and by which the several signers, (after reciting the formation and object of the said society, to wit, the support of the preaching of the gospel in the north parish in *Woodstock*,) covenanted to pay annually for that object, into the treasury of said society, the several sums annexed to their respective names, so long as each should live within six miles of said place of worship. The sum annexed to the name of the said *Healey* was $3. The breaches alleged were the nonpayment of said sum annually, from 1810 to the time of his death, in 1825. Plea the *general issue.* At the trial in the county court, December term, 1828, the plaintiffs gave in evidence the covenant, and articles of association, signed by the said *Healey* and others. The defendant then offered evidence tending to show that the said *Healey*, at the time of signing as aforesaid, and from that time until his death, was an inhabitant of *Hartland*, and not an inhabitant of *Woodstock*. The plaintiffs objected to the admission of said evidence, and it was rejected by the court. The defendant then offered evidence tending to show, that on the 1st of March 1810, *Healey* paid into the treasury of said society all that was due, agreeably to the aforesaid articles ; and that the further maintenance and support of the minister of said society, from that time to the time of his death, was contrary to the dictates of his conscience, of which said society was notified ; and that he, on the 1st of March, 1810, did withdraw himself from said society

and the church connected therewith, and did join himself to, and become a member of, a church and society in *Hartland* aforesaid, called the *Chrystian Society*, (being a society for religious worship) and from that time until his death, did continue to be a member of said church and society, and did contribute to the support of religious worship therein ; of all which the plaintiffs had notice on the 1st of March,1810, and that the plaintiffs never after called on *Healey*, or demanded any further pay of him, during his life ; to which evidence the plaintiffs objected, and it was rejected by the court. The defendant excepted, and requested the court to charge the jury, that from the aforesaid facts the plaintiffs were not entitled to recover : but the court refused so to charge, but informed the jury that the plaintiffs were legally entitled to recover ; and the jury returned a verdict for the plaintiffs to recover for the last eight years, considering the rest barred by the statute of limitations. The defendant excepted to the charge also, and the cause now came on to be heard on said exceptions.

WINDSOR,
*February,*
1829.

Cong'l. Society
of
Woodstock
*vs.*
Swan, Adm'r
of
Healey.

*Everett and Collamer, for the defendant.*—I. This society was formed under the first section of the act of 1797, the other sections having been repealed. The whole statute taken together only authorises the association of inhabitants of the same town, parish, &c. being places incorporated with town privileges. It is contended that the repeal of all but the first section in no way increased the power, but only authorised that to be done voluntarily which was before done by force of law. *Healey*, not being at the time of the association, or ever after, an inhabitant of *Woodstock*, could not therefore be bound.

II. It is contended that inasmuch as by the articles of association a member, ceasing to pay, ceased any longer to be a member, the consideration and reciprocity is destroyed if he be still bound to pay, and he is therefore discharged.

III. The testimony offered should have been admitted, that the defendant might thereupon have argued to the jury a presumption that the intestate had been by the plaintiffs discharged.

IV. This is an action to recover a number of instalments claimed against the intestate by virtue of his contract for the support of a minister of the gospel of a particular religious sect; and the defence offered is, that during the time the instalments accrued, it was contrary to the dictates of the conscience of said intestate to support said minister, of which the plaintiffs were informed. Is this a defence?

1. It is a natural and unalienable right in man to render to God that worship which conscience dictates is accepted in his sight ; and this is not only a right but an obligation paramount to

WINDSOR, all other undertakings, and hence constituting an exception and
February, condition to them all. A most lucid and distinct view of this subject
1829.
Cong'l. Society is presented in the memorial of the baptists of *Virginia* to the le-
of gisluture of that state, from the pen of *ex-president Madison.*—
Woodstock
vs. *(See the memorial.)* If this right is incapable of alienation ; if a
Swan, Adm'r man would not be bound by the laws of government to regulate wor-
of
Healey. ship where he had expressly delegated that power, much less would
he be bound by any contract he could make on the same subject
with any inferior association. Most clearly all such engagements
must in the nature of things be taken with the condition express-
ed or implied, so long as the same is not contrary to the dictates of
conscience.

2. This view of the subject appears distinctly recognized by
our constitution, (chap. 1. art. 3,) "All men have a natural
" and unalienable right to worship God according to the dictates of
" their own consciences, and that no man ought to, or of right
" can be compelled to attend any religious worship, or erect or
" support any place of worship, or maintain any minister, contrary
" to the dictates of his conscience." These expressions are all
in one sentence. The latter are but modes of exercising the first
declared right. They are all subject to the same qualifying word,
that is, *unalienable.* It would be doing the greatest violence to
the English language and common sense to divide this sentence.
That man cannot be compelled to support any particular ministry,
stands connected with, and is subject to, the same construction, as
that he cannot be compelled to attend any particular worship. If
these are rights which cannot be delegated to government, how
can they be alienated to any particular society. It is as much a
part of the rights of conscience in religious worship that a man
should not be compelled to sustain a form of worship which is
against his conscience, as that he should be free to offer such wor-
ship as his conscience approves. And it is further provided in
this same article of the constitution " that no authority can, or
" ought to be, vested in, or assumed by,any power whatever, that
" shall in any case interfere with, or in any manner control, the
" right of conscience in the free exercise of religious worship."

3. It may perhaps be said, it does appear that government does
not possess the power by law to compel a man to support any
particular ministry contrary to the dictates of conscience, because
civil government, being but a compact between the state and in-
dividuals, has not that power delegated to it by the individuals in
that civil compact, but still that individuals are bound by any con-
tract they may make with a particular society to the same effect,
not by law, but by contract. This is loosing sight of what both

reason and the constitution clearly declares, that is, that man has not merely not delegated such a power, but that the same is incapable of being parted with by contract, any more than any other unalienable right; such as personal liberty, security, right to hold property, or pursue happiness.

4. This contract derives no force from our statute, as that must be subject to the constitution.

5. If this doctrine be obnoxious to the minds of men, it will be from its application, not from its abstract character. If it be sound and acceptable in any case, it is applicable in all. It is at least supposable that a man might conscientiously promise to support a Romish church. Now must he forever do this, however his subsequently enlightened conscience might be disgusted with its mumeries, or shocked at its impositions? If the support of a particular ministry and worship can be forever enforced on a man by his contract, contrary to his conscience, his attendance on a particular worship may be enforced by the same means, for they stand on the same ground in the constitution. If a man at any time conscientiously should execute a written contract personally to attend the worship of a church holding the doctrine of universal salvation, under a large sum, as liquidated damages, for each delinquency, is it possible an action could here be maintained against him, after the performance of such a contract had become the most direct violation to his subsequently formed christian feelings.

6. Was the mind capable of infallibility in the formation of religious opinions, some more reasons would exist for holding him to a contract on this subject. But so long as we remain as at present constituted, and reserve to ourselves the right and the duty to form our religious opinions, it must necessarily continue a part of this right to change those opinions as light and reason and conscience dictate. Hence man should be held unshackled from even his own indiscretions. We have thus attempted to show that man cannot by contract deprive himself of the constitutional right to support that ministry only which his conscience approves.

7. Much may perhaps be said about the policy of the law—that the prosperity of the church and the good of society demand that this defence should be put down. Let it be remembered it is not a quibbling subterfuge which the defendant presents. He claims only the right to convince an impartial jury of his country that as he conscientiously entered into this contract when he considered it his christian duty to support that ministry, so he claims to be released after it became contrary to his views *honestly entertained*. That dangerous consequences would follow, if men were to be released from their contracts of this character, on honest change of

Cong'l. Society
of
Woodstock
vs.
Swan, Adm'r
of
Healey.

WINDSOR,
*February,*
1829.

Cong'l. Society
of
Woodstock
*vs.*
Swan, Adm'r
of
Healey.

opinion, seems without foundation. Because, honest and considerate men would more readily enter into such associations on such conditions than without it, and more would be realized for the support of the gospel than if community were told no change of sentiment will discharge; no outrage of conscience excuse one. It ill becomes any sect of the christian church to say its prosperity, in any measure, depends on contributions coerced by law or contract, against the wishes and consciences of men. It may be best that the church should be disabused of all artificial supports of government from which history shows most of its corruptions deducible, and that we should here have a government supported by religion, and not religion supported by government. The friends of religion will then be known by the unpledged and free will offering which they from time to time may make. It is not possible to say what sect may be finally the gainer ; but truth and the author of our religion, and the devotion of its friends, will finally prevail, if our people be left as our constitution intended they should be left, free to support that worship, and that only, which conscience dictates for the time being.

*Marsh, for the plaintiffs.*—The only important point is, that about the 1st of March, 1810, it became against the intestate's conscience to pay for the support of public worship in the manner he had contracted to do. The defence on this point must be grounded on the 3d section of the bill of rights in the constitution of this state. *Stat. p.* 41. This article in the bill of rights, with which it is thought no man who properly understands and duly appreciates the principles of civil liberty can find fault, seems to distinguish between those rights of conscience which are unalienable, and those which he may divest himself of by contract. Of the first sort is only that of worshipping Almighty God according to the dictates of conscience and understanding, as in their opinion shall be regulated by the word of God. It is here freely admitted, that no man can be compelled by any contract to worship God in any particular manner, and, for the same reason, cannot be compelled to attend any religious worship. And it is also admitted that no man can be compelled to erect, or assist in erecting, or supporting, any place of worship, or maintaining any minister, but by his own voluntary consent and contract. But the last clause of this same article declares it to be " the duty of every sect or denomination of christians *to observe the sabbath, or Lord's day,* and *keep up some sort of religious worship, which to them shall seem most agreeable to the revealed will of God.*" The expression " *religious worship,*" standing in this connection, must undoubtedly mean public

worship. But how is public worship to be kept up or maintained without some agreement or contract among those who think it a duty, and esteem it a privilege, to congregate together for this purpose? How are houses for public worship to be erected and sustained, but by contract and agreement among those who wish to occupy them for that object? No sect of christians is known to exist which does not regard the public preaching of the gospel as an essential part of public worship, and as being of divine apointment, and do not believe that he who preaches is entitled to a support to some extent. How then is this support to be had without some agreement or contract among those who are to be benefitted by attendance on this ordinance? Now, if these great principles, and the duties arising from them, were not recognized by the constitution, yet they are self evident from the light of nature aided by revelation.

Windsor,
February,
1829.

Cong'l. Society
of
Woodstock
vs.
Swan, Adm'r
of
Healey.

If then any contracts for these objects are binding, and can be enforced by legal proceedings after the party has changed his religious sentiments, it is believed that it is easy to show that every contract for the same objects may be enforced for the same reasons. Suppose then I agree to pay a certain sum to a mechanic towards erecting a place of public worship, and execute my note or bond for the amount: after the work is done, I change my sentiments, and deem the mode of worship, which it is agreed is to be adopted in the house, not only to be wrong, but even impious or blasphemous, and this before the money is paid; am I therefore to be absolved from my note or bond?

It is as much contrary to my conscience to contribute my money after the work is completed, if I have changed my sentiments, as it would have been, if the change of sentiment had happened before the work was done, and I had declared off. The party with whom I contracted to build a meeting house for worship, according to what I then thought agreeable to the revealed will of God, was then as much opposed to the mode of worship proposed, as I now am, but I have drawn him in to do the work for me, but when the work is done I have found out that it is contrary to my conscience to erect this house of worship, and therefore refuse payment.

Again, a number of persons agree to settle a minister and support him by a tax on their polls and rateable estate—a contract is made by which a given sum is to be raised in this way, and paid to the minister annually—that is, on the polls and estate of such as subscribe the contract.—The consequence is that all those who are honest, and do not change their sentiments, continue bound to raise this sum by tax, and if any part of the subscribers may discharge themselves by changing their religious sentiments, and

WINDSOR,
February,
1829.

Cong'l. Society
of
Woodstock
vs.
Swan, Adm'r
of
Healey.

that for what is due, as well as for what is yet to fall due, those who remain must be charged with an intolerable burden, or change their sentiments also, in order to avoid it—and if all take this course, the minister, who has not been punctually paid, may have laboured perhaps successfully, yet in vain, as to his support. Indeed, if the doctrine contended for by the defendant's counsel can prevail, all contracts of this kind, and all who may at any time have been concerned in them, are thrown into confusion, and the last clause of the third article of the bill of rights, and the statute of 1797 (*Comp. Laws*, p. 600,) which was enacted with a view to this article, became a dead letter.

To us it appears that the first section of the statute was passed in exact accordance with the principles of this article in the constitution ; that is, that no man shall be bound against his conscience to contribute to any religious object ; but if he contract, he thereby waives any objection on the score of conscience, and his contract becomes the measure of his conscience. And one would think that a very tender conscience would have as much sensibility in performing a solemn contract, as on the subject of contributing to the support of religious worship according to the ceremonies of any christian people, however differing from his own.

The true principle is, that when a man makes a contract to contribute to any religious or benevolent object, the consideration being a legal one, it becomes a mere *civil contract*, and the court cannot (more than in any other case) enquire into the consideration, further than to ascertain whether it be such a consideration as the constitution and laws of the state recognize as being legal and valid ; and if it were so at the time of entering into it, it cannot become illegal by any thing which the obligor may say, do, or think, afterwards.

The defendant is estopped by his own deed, in which he acknowledges the duty he has taken upon himself to be a moral and religious duty, from now saying it is against my conscience to perform this duty :—this evidence is not therefore admissible to avoid his own deed.

How is a man to prove that he has changed his sentiments in religion, and that that, which he once approved, is now against his conscience ? He may show that he has said it was contrary to his conscience ; but his declarations are not evidence in his own favor. He may show that he has joined some other society, and contributed to its support : but how will he show that his motive was a religious scruple ? It may have been because another place of worship was more convenient for him ; or it may be because he can get along with paying less than he has contracted to pay among

his old friends. It therefore comes to this, that a man may say he has changed his sentiments, and that to pay what he has covenanted to pay is contrary to his conscience, and he thereby avoids his most solemn contract.

WINDSOR,
*February,*
1829.

Cong'l. Society
of
Woodstock
*vs.*
Swan, Adm'r
of
Healey.

TURNER, J. pronounced the decision of the Court.—The defendant's rights are all guaranteed to him by the laws of the land, and if there has been an infraction of those rights, the verdict must be set aside and a new trial granted; that is, if there was error in the decisions of the county court, or in their charge to the jury. Let us examine the plaintiffs' claim and the defence as presented. If the society was legally formed, it could undoubtedly bind, and be bound, by all its legal contracts. It is admitted that it was formed under the first section of the act of 1797, and that the other sections were repealed. The inquiry is, whether the association is agreeable to that section which enacts, " That when any num-" ber or description of persons shall voluntarily associate, and " agree to hire a minister, to fix on a place or places, or to erect " a house or houses, for social and public worship; all contracts " made by such persons with such minister, or with each other, for " the purposes aforesaid, shall be binding and valid to all intents " and purposes." As the act authorises the association of any number or description of persons, and does not confine them within any limits, of course they had a right to extend it beyond the boundaries of their own town. Consequently, it can be no defence that the intestate was not an inhabitant of *Woodstock.* As it appears that the society was formed to carry into effect the object contemplated by the act, to wit, the support of the ministry, and as this contract was entered into for that purpose, it must, at its creation, have been binding.

We are next to inquire whether the defendant has been absolved from from his contract.

By the articles of the compact, a member, ceasing to pay, ceased any longer to be a member of the society. Contracts are to be so construed as to carry into effect the minds of the parties at the time they are made. This contract in its nature, character and form, must have been designed to be binding, permanent, and lasting; otherwise, it could not have promoted the object for which it was intended. It cannot be presumed that the parties thought of ever discharging themselves, by refusing to fulfill their engagements. A member, ceasing to become a member by ceasing to pay, would only deprive himself of the right of directing the application of the funds of the society : if a member of the church, he would have all the rights to which he was before entitled; if

WINDSOR,
February,
1829.

Cong'l Society
of
Woodstock
vs.
Swan, Adm'r
of
Healey.

not, he would have the same privileges of public worship that any member of the society could have.

We will next inquire whether the evidence offered by the defendant to show that he was discharged was legally excluded. If he had been discharged, it must have been by a vote of the society, and that appearing of record ; and the admission of such parol testimony could not be upon legal principles, unless it were first shown, that the record was lost or destroyed. Our rights would be very insecure if jurors were permitted to presume facts that the law requires should be shown by record ; especially of a recent date. We have now arrived at the principal ground of defence, and the question is, whether it is constitutional to compel the defendant to fulfil his contract, when, as he says, it became contrary to the dictates of his conscience to support said ministry, in March 1810, and so continued till his death in 1825.

We freely admit that the constitution secures to every man the right to worship Almighty God according to the dictates of his conscience and understanding, as in his opinion shall be regulated by the word of God ; and that no man can be compelled to attend any religious worship, or maintain any minister, contrary to the dictates of his conscience : and we further admit that all contracts must be made in view of our duty to our Creator, considering that his claims are paramount to that of any civil society.

We are now to ascertain, whether those rights are violated by enforcing the contract. It is admitted that it was voluntarily and conscientiously entered into, and the intestate then considered it his christian duty to support that ministry. It was founded on a moral and legal consideration, and to affect a very interesting and important object, and must, when formed, have been binding ; and would have undoubtedly remained so, had not the intestate changed his religious sentiments. And so far it must have been consistent with his allegiance to his Creator. It is a fundamental principle, both in law and religion, that all contracts that are legal when made, (all things remaining as they were,) continue binding on the contracting parties. It is not contended but that all things did remain as they were from the formation of the compact to the death of the intestate, and of course the contract would be valid : and no allegiance to his Creator would require him to violate it ; and it is impossible that the obligor can furnish a legal defence which exists only in his own mind. The principles here established fully dispose of the defence presented. If we admit that a change of religious sentiment could exonerate the defendant from his contract, how is it to be shown ? It is a well established principle in legal proceedings, that a cause must be so pleaded that

it be capable of trial, (3 *Bl. Com. p.* 308) that is, the defence <span>Windsor, February, 1829.</span> must be such, as can be affirmatively shown to the jury by legal testimony. Suppose he had gone to the jury with his defence, <span>Cong'l. Society of Woodstock *vs.* Swan, Adm'r of Healey</span> how could he have shown a change of religious sentiments ? He certainly could not furnish evidence for himself by his own declarations, or by his own conduct ; and such illegal testimony must have been excluded. The defendant's counsel have compared this with a case where a man should execute a written contract, personally to attend the worship of a church holding the doctrine of universal salvation, under a large sum, as liquidated damages, for each delinquency, and ask if it should be enforced ? we answer, it could not, nor to hear *St. Paul* preach, had he been on earth, not being authorised by said act, nor any legal principles. The constitution has wisely placed all denominations, and all men, upon the same ground, as to religious principles ; and has secured to all the rights of conscience, as to religious worship,to the erecting or supporting places of worship, or to the maintaining of any minister, and has treated them all as free agents, capable of acting, choosing, worshipping, and contracting for themselves. We have examined the authorities cited by the plaintiff's counsel, and find them applicable to the present case.

Judgment of the county court affirmed.

*Charles Marsh,* for plaintiffs,
*Everett* and *Collamer,* for defendant.